# EXHIBIT A

**Please Note:**
**The Documents Appended Hereto Have Been Redacted**
**To Prevent Any Possible Disclosure of Personal And Private Information**

**Any Documents Marked As A True And Correct Copy**
**Have Also Been Redacted For This Purpose**

Prepared by: DWAYNE CRAWFORD

LOAN #:

# INTEREST ONLY ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| MAY 26, 2006 | EAST PROVIDENCE | RHODE ISLAND |
|---|---|---|
| [Date] | [City] | [State] |

137 GREENWOOD ST, WORCESTER, MA 01607-1517
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 240,000.00       (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
AMERICA'S WHOLESALE LENDER
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    8.980 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment on the first       day of every month, beginning on  JULY 01, 2006       .
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay Principal and interest by making a payment every month as provided below.

I will make my monthly payments of Principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note.

Each monthly payment will be applied as of its scheduled due date, and if the payment includes both Principal and interest, it will be applied to interest before Principal. If, on  JUNE 01, 2036       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,796.00       . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the  first       day of JUNE, 2008       , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."



If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX & 78/100 percentage point(s) ( 6.780 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.480 % or less than 8.980 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 15.980 % or less than 8.980 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both Principal and interest on this Note (the "First Principal and Interest Payment Due Date") will be the first monthly payment date after the sixtieth (60th) scheduled monthly payment.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. Such an advance payment of Principal is known as a "Prepayment." I may make partial or full Prepayments. When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term during which my payments consist only of interest as well as during the time that my monthly payments consist of principal and interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

☒ I may prepay this Note in full at any time without penalty.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 3.000 % of my overdue payment of interest, during the period when my payment is interest only, and of Principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

● Interest Only ARM Note
2D972-MA (10/05)                                      Page 2 of 3

A. P.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Altagracia Paulino_
ALTAGRACIA PAULINO                                    -Borrower

PAY TO THE ORDER OF

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC., A NEW YORK CORPORATION
DOING BUSINESS AS AMERICA'S WHOLESALE LENDER

BY: _Michele Sjolander_
MICHELE SJOLANDER
EXECUTIVE VICE PRESIDENT

-Borrower

-Borrower

-Borrower

*[Sign Original Only]*

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
DWAYNE CRAWFORD



------- [Space Above This Line For Recording Data] -------

PAULINO
[Escrow/Closing #]                    [Doc ID #]

# MORTGAGE



## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   MAY 26, 2006         , together with all Riders to this document.
(B) "Borrower" is
ALTAGRACIA PAULINO, AND MILEDY PAULINO, AS JOINT TENANTS

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613
(E) "Note" means the promissory note signed by Borrower and dated  MAY 26, 2006         . The Note states that Borrower owes Lender
TWO HUNDRED FORTY THOUSAND and 00/100

Dollars (U.S. $ 240,000.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  JUNE 01, 2036       .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 11

VMP -6A(MA) (0401)  CHL (08/05)(d)       VMP Mortgage Solutions, Inc. (800)521-7291              Form 3022  1/01







DOC ID #: ▮▮▮▮▮▮▮▮▮

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

| COUNTY | of | WORCESTER | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number:                                        which currently has the address of
                    137 GREENWOOD ST, WORCESTER
                              [Street/City]
Massachusetts 01607-1517 ("Property Address"):
          [Zip Code]

*W.P.  A.P.*

DOC ID #:

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.

DOC ID #: ███████

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

DOC ID #:

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

A.P. MP

DOC ID #: ███████

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

A.P. MP.

DOC ID #:

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this

A.P.M

DOC ID #: ▓▓▓▓▓▓

Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

DOC ID #: ▓▓▓▓▓▓

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(MA) (0401)    CHL (08/05)    Page 9 of 11    Form 3022 1/01

DOC ID #: ▮▮▮▮▮▮▮▮▮

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Altagrocia Paulino_ (Seal)
ALTAGRACIA PAULINO                    -Borrower

_Miledy Paulino_ (Seal)
MILEDY PAULINO                        -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

DOC ID #: ▓▓▓▓▓▓

COMMONWEALTH OF MASSACHUSETTS,                    Worcester            County ss:

On this 26th day of May, 2006, before me, the undersigned notary public, personally appeared

Atacjacia Paulino

ane

Miledy Paulino

proved to me through satisfactory evidence of identification, which was/were MA State ID & US Passport to be the person(s) whose name(s) is/are signed on the preceding document, and acknowledged to me that he/she/they signed it voluntarily for its stated purpose.

My Commission Expires:    4|23|10
(Seal)

Notary Public

EXHIBIT "A"

PARCEL 1

A certain tract or parcel of land situated on the easterly side of
Greenwood Street, in Worcester, Worcester County, Massachusetts,
bounded and described as follows:

Beginning at a point in the easterly line of Greenwood Street, at
land now or formerly of Samuel D. Tatman;

Thence by said Tatman land, S. 56° 4' 30" E., one hundred (100) feet
to a point;

Thence S 37° 46' W one hundred (100) feet to a point;

Thence N 56° 8' 40" W ninety-five (95) feet to a point in the
easterly line of Greenwood Street;

Thence Northerly by said easterly line of Greenwood Street by a curve
to the left having a radius of seven hundred eleven and 72/100
(711.72) feet one hundred (100) feet to the point of beginning.

The house on said premises is numbered 137 Greenwood Street.

Also conveying a certain tract or parcel of land situated to the east
of the easterly line of Greenwood Street, bounded and described as
follows:

PARCEL:

Beginning at a point in the northeasterly corner of the tract
hereinabove conveyed at land now or formerly of Samuel D. Tatman;

Thence S 56° 4' 30" E by said Taman land sixteen and 24/100 (16.24)
feet to a point;

Thence S 36° 51' W by land of said Tatman, ninety-nine and 89/100
(99.89) feet to a point;

Thence N 56° 8' W seventeen and 85/100 (17.85) feet to the point
southeasterly corner of the tract hereinabove conveyed;

Thence N 37° 46' E by the easterly line of the tract herein conveyed
one hundred (100) feet to the point of beginning.

Excepting from Parcel II approximately 30 square feet deeded out in
Book 3678, Page 365 and corrected and confirmed in Book 3951, Page
464.

Being the same premises as conveyed by deed and recorded with the
Worcester District Registry of Deeds in Book 22093 at Page 351.

PROPERTY ADDRESS:
137 Greenwood Street
Worcester, MA 01607

—————————[Space Above This Line For Recording Data]—————————

# INTEREST ONLY ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
DWAYNE CRAWFORD

PAULINO
[Escrow/Closing #]                          [Loan #]

THIS INTEREST ONLY ADJUSTABLE RATE RIDER is made this TWENTY-SIXTH      day of
MAY, 2006      , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to
COUNTRYWIDE HOME LOANS, INC.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
137 GREENWOOD ST
WORCESTER, MA 01607-1517
[Property Address]

**MULTISTATE INTEREST ONLY ADJUSTABLE RATE RIDER - LIBOR INDEX**
• 8C - Interest Only ARM Rider                                    Initials:
2E121-XX (02/04)(d)                     Page 1 of 3

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of        8.980  %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the  first                     day of
JUNE, 2008        , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding
SIX & 78/100              percentage point(s) (   6.780 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than    10.480 % or less than      8.980 %. Thereafter, my interest rate will never be increased or decreased on any Change Date by more than single ONE & ONE-HALF                      percentage point(s) (    1.500 %) from the rate of interest. I have been paying for the preceding six months. My interest rate will never be greater than      15.980  % or less than       8.980 %.

### (E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### (G) Date of First Principal and Interest Payment
The date of my first payment consisting of both principal and interest on the Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

Initials: A.P  M.P

● BC - Interest Only ARM Rider
2E121-XX (02/04)                Page 2 of 3

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Interest Only Adjustable Rate Rider.

_____ (Seal)
ALTAGRACIA PAULINO                 - Borrower

_____ (Seal)
MILEDY PAULINO                     - Borrower

_____ (Seal)
                                   - Borrower

_____ (Seal)
                                   - Borrower

● BC - Interest Only ARM Rider
2E121-XX (02/04)                   Page 3 of 3

ATTEST: WORC. Anthony J. Vigliotti, Register



Property Address:   137 Greenwood Street, Worcester, Massachusetts

# ASSIGNMENT OF MORTGAGE

Mortgage Electronic Registration Systems, Inc. ("MERS") solely as nominee for Lender (America's Wholesale Lender) and Lender's successors and assigns, holder of a real estate mortgage

from Altagracia Paulino and Miledy Paulino
to Mortgage Electronic Registration Systems, Inc. ("MERS") solely as nominee for Lender (America's Wholesale Lender) and Lender's successors and assigns
dated May 26, 2006
recorded in the Worcester County Worcester District Registry of Deeds in Book 39052, Page 296

assigns without recourse in any event said mortgage and the note and claim secured thereby to The Bank of New York Mellon f/k/a The Bank of New York as Trustee for the Certificateholders CWABS, Inc. Asset-Backed Certificates, Series 2006-11 c/o Bank of America, 7105 Corporate Drive PTX-C-35, Plano, TX 75024.

*IN WITNESS WHEREOF*, the said Mortgage Electronic Registration Systems, Inc. ("MERS") solely as nominee for Lender (America's Wholesale Lender) and Lender's successors and assigns has caused its corporate seal to be affixed and these presents to be signed in its name and behalf by *Aida Duenas* its *Assistant Secretary* this *15* day of *August*, A.D. 2011.

Signed and sealed in the presence

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC. ("MERS") SOLELY AS NOMINEE FOR
LENDER (AMERICA'S WHOLESALE LENDER) AND
LENDER'S SUCCESSORS AND ASSIGNS

By:
Signature:
Name:
Title: Aida Duenas Assistant Secretary

STATE OF CALIFORNIA

County of Ventura , S.S.          August 15 , 2011

On August 15 2011 Eric Tony, Notary Public , before me personally appeared Aida Duenas ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

Signature                                    (Seal)

File No.:
MERS

Stanton & Davis
1000 Plain Street
Marshfield, MA 02050

ERIC T. WAY
Commission # 1835518
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2013

# EXHIBIT B

**Please Note:**
**The Documents Appended Hereto Have Been Redacted**
**To Prevent Any Possible Disclosure of Personal And Private Information**

**Any Documents Marked As A True And Correct Copy**
**Have Also Been Redacted For This Purpose**


www.RRReview.com
866-876-5095

| Account # | | Order # | 4981806 |
|---|---|---|---|
| Client | Select Portfolio Servicing, Inc. | Group ID | M77 |
| Inspection | Exterior | Occupancy | Occupied |
| Effective Date | 10/01/2020 | County | Worcester |
| Owner | ALTAGRACIA PAULINO | Parcel # | M29B046L00002 |
| Address | 137 GREENWOOD ST WORCESTER MA 01607 | | |
| Correction | | | |

## General Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Type | Single Family | Housing Inventory | Decreasing | Tax Assessed Value | $203,700 | Neighborhood Low | $220,000 |
| Location | Suburban | Property Values | Improving | Annual Property Tax | $3,462 | Neighborhood High | $320,000 |
| Ownership Type | Fee-simple | Land Value | $66,100 | Neighborhood Predominant | $270,000 | Typical/Distressed Marke ing | 120 / 30 days |

## Listing and Sale Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Currently Listed | No | Current List Price | - | Last Sale Price | - | Prev. List (12 Mos.) | No |
| Listing Date | | Original List Price | - | Last Sale Date | - | Prev. Sale (36 Mos.) | No |

**Subject Comments**  Subject is a Single family home located in a suburban area on a lot of 0.25 acres that conforms well with the other homes in that (See Addendum)

## Comparable Information

| | Subject | Sale 1 | Sale 2 | Sale 3 | Listing 1 | Listing 2 | Listing 3 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Address | 137 GREENWOOD ST , 01607 | 55 SOUTHHOLD RD , 01607 | 7 BLAINE AVE , 01603 | 12 HALMSTAD ST , 01607 | 5 TENNYSON ST , 01610 | 13 KNOX STREET , 01603 | 9 AURILLA STREET , 01607 |
| Proximity | - | 0.67 Miles | 2.92 Miles | 0 25 Miles | 0.81 Miles | 2.27 Miles | 0.88 Miles |
| DataSource | Tax Records | MLS:72639716 | MLS:72574388 | MLS:72622122 | MLS:72734391 | MLS:72722070 | MLS:72726840 |
| HOA | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Fair Market Rent | $2,000 | $2,500 | $2,200 | $2,100 | $2,300 | $2,450 | $2,780 |
| Sale Type | - | Arms Length | Arms Length | Arms Length | Arms Leng h | Arms Length | Arms Length |
| Orig List Price | - | $279,952 | $279,900 | $298,900 | $239,900 | $273,900 | $299,999 |
| Current List Price | - | - | - | - | $239,900 | $273,900 | $299,999 |
| Orig List Date | - | 04/01/2020 | 10/03/2019 | 02/20/2020 | 09/29/2020 | 09/08/2020 | 09/16/2020 |
| Sale Price | - | $240,000 | $278,400 | $298,900 | - | - | - |
| Concessions | - | $0 | $0 | $0 | - | - | - |
| Sale Date | - | 07/15/2020 | 11/05/2019 | 04/27/2020 | - | - | - |
| Financing | - | Conventional | Conven ional | Conventional | - | - | - |
| DOM | - | 105 | 33 | 67 | 4 | 25 | 17 |
| # of Units | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Style | 2 Story | 2 Story | 2 Story | 2 Story | 2 Story | 2 Story | Cape Cod |
| Lot Size | 0.25 acres | 0.82 acres | 0.16 acres | 0.14 acres | 0.19 acres | 0.29 acres | 0 34 acres |
| View | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Neighborhood |
| Condition | Average | Average | Average | Good | Average | Average | Good |
| Year Built | 1870 | 1917 | 1890 | 1930 | 1921 | 1887 | 1930 |
| Total Room Count | Rms/Bds/Full/Half 7/4/2/0 | Rms/Bds/Full/Half 8/4/2/0 | Rms/Bds/Full/Half 7/3/1/1 | Rms/Bds/Full/Half 8/4/2/0 | Rms/Bds/Full/Half 8/4/2/0 | Rms/Bds/Full/Half 6/2/1/1 | Rms/Bds/Full/Half 6/3/2/0 |
| Above Grade Sq Ft | 1710 | 1568 | 1854 | 1924 | 1820 | 1463 | 1405 |
| Basement SF | 1182 | 780 | 920 | 960 | 910 | 730 | 700 |
| % Basement Finish | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Garage/Carport | 0 None | 0 None | 0 None | 0 None | 0 None | 0 None | 1 Detached |
| Pool/Spa | No | No | No | No | No | No | No |
| Amenities | A/C | A/C | A/C | A/C | A/C | A/C | A/C |
| Best Sale/List | | | X | | | X | |
| Adjustment for Differences | - | -$20,420 | -$19,080 | -$29,790 | -$23,060 | -$10,385 | -$21,405 |
| Adjusted Price | - | $219,580 | $259,320 | $269,110 | $216,840 | $263,515 | $278,594 |
| SP / GLA Per SF | $146.20 | $153.06 | $150.16 | $155.35 | $131.81 | $187.22 | $213.52 |

## Comparable Comments (See Page 3)

## Marketing Strategy

| | | | |
|---|---|---|---|
| 30 Day As Is | $245,000 | 30 Day Repaired | $245,000 |
| 90 - 120 Days "As Is" | $250,000 | 90 - 120 Days "Repaired" | $250,000 |
| As-Is List Price | $255,000 | Repaired List Price | $255,000 |
| Estimated Repairs | $0 | (See following page for repair details) | |

## Subject & Neighborhood Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Zoning: | SFR | Current Use: | Single Family | HOA Fee: | $0 | |
| | Zoning Code: | Residential | Projected Use: | Single Family | HOA Ameni ies: | - | |
| Neighborhood Comment | | Subject is located in a single family neighborhood and conforms to neighborhood which displays general similarity in design, appeal and utility with variations in size. There are no adverse site conditions or external factors such as easements, encroachments, environmental conditions or land uses. Proximity and convenience to employment, schools, parks, shopping and transportation are good. Estimated % of REO Homes: 0%. | | | | | |
| Environmental Issues | | No | | | | | |
| Functional or Economic Obsolescence | | No | | | | | |
| Positive / Negative Features | | Based on the exterior observation, subject appears to be in average condition. No Negative Attributes. | | | | | |
| Sewer | | Public | | | | | |
| Water | | Public | | | | | |

## Repairs – Exterior

| Item | Description | Estimated Cost |
|---|---|---|
| 1. Exterior Finish | - | $0 |
| 2. Painting | - | $0 |
| 3. Windows | - | $0 |
| 4. Roof | - | $0 |
| 5. Structural | - | $0 |
| 6. Landscaping | - | $0 |
| 7. Ou buildings | - | $0 |
| 8. Debris Removal | - | $0 |
| 9. Utility | - | $0 |
| 10. O her | - | $0 |
| **Grand Total for Cost of Repairs** | | **$0** |

## Quality Control Review

| Item | Quick Sale | 90 - 120 Day |
|---|---|---|
| Field "As Is" Price | $245,000 | $250,000 |
| "As Is" Price Adjusted by Quality Control | $0 | $0 |
| Field "Repaired" Price | $245,000 | $250,000 |
| "Repaired" Price Adjusted by Quality Control | $0 | $0 |

### Quality Control Comment

Passed QC Review

### Map Comments

This report has passed automated quality control criteria and map qc review.

## Purpose

The purpose of this analysis is to provide a probable sale price of the subject property. This analysis is not to be used in lieu of an appraisal for the purpose of determining whether to approve a mortgage loan. Nothing in this report should be construed as a guarantee of value or condition of the subject property. This analysis is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practices. This report is for the internal use of the name client listed above, and is to assist with mortgage due diligence and internal decision-making processes. It will not be used for loan origination.

## Addendum

1. **Subject Comments** - Subject is a Single family home located in a suburban area on a lot of 0.25 acres that conforms well with the other homes in that area.Due to the short supply of homes on the market, it was necessary to expand the proximity Upto 3 and expand the market research beyond 30 % Year Built and Inferior bed for attaining most favorable comps resembles same as subject style and condition and even adjustments are provided for every exceeded criteria.Since there were limited comparable available within subject market neighborhood, it was necessary to use a sold comp with a sale date beyond 6 mon hs from the date of this report. In my search upto 1 miles I was unable to find similar Year Built comparables, hence I forced to use Superior Year Built comparable and adjustments were made.Sold comp 2 and list 1 are most similar in condition to the subject and was priced in line with those comps. Sold 3 and List 3 are good condition comps which I was forced to use in this report with adjustments due the unavailability of similar condition comparables. I strongly believe that the comps I have used in this report are good and they emphasize the actual market value of the subject. Subject is located on a well traveled road with influences of commercial properties on 3 sides of the home. I was unable to locate o her properties within close proximity with similar influences; therefore, I have made proper location adjustments for each comp used. Zoning: SFR.
Property Type: Vendor agrees with the provided property characteristics.
# of Units: Vendor agrees with the provided property characteristics.
Lot Size (Ac.): Vendor agrees with the provided property characteristics.
Year Built: Vendor agrees with the provided property characteristics.
Room Count: Vendor agrees with the provided property characteristics.
Bed Count: Vendor agrees with the provided property characteris ics.
Ba h Count: Vendor agrees with the provided property characteristics.
Living Sq.Ft.: Vendor agrees with the provided property characteristics.
Basement (Y/N): Vendor agrees with the provided property characteristics.

2. **Sale 1 Comments** - Inferior: HUGE PRICE REDUCTION!!!!!Location, Location, Location!!!! What a unique opportunity to own this 4 bedroom 2 bathroom house on the Worcester/Auburn line. First floor has 1 bedroom, 2 living rooms - hardwood floors - huge cabinet packed eat in kitchen, sun room, full bath, and LAUNDRY!!!!! 2nd floor boasts 3 bedroom and a full bath. Enjoy the enormous cleared flat yard or subdivide the yard into 2 potentially buildable lots. Motivated Seller!! Property being sold as is. Call today to set up a showing!!! Property will not qualify for FHA or VA. Adjustments: GLA :$2130, Year Built :-$1410, Lot size :-$1140, Location:-$20,000

3. **Sale 2 Comments** - Similar: The beauty of New England is embodied in this Dutch Colonial 3 bedroom 1 and a half bath home. You will be amazed by the stunning original hardwood flooring throughout the first floor and the beauty in the craftmanship of the wooden walkways and stairway banister. The sundrenched kitchen with built in pantry, ample amount of cabinets and counter space complete with breakfast nook and vaulted ceilings. Enjoy the warmth of the original wood burning fireplace on those cold winter evenings. Upstairs you will find the master bedroom with 2 ft Cathedral ceilings and brand new wall to wall carpet. Convenient upstairs laundry and ample amount of storage space in the attic and walk out basement. Entertain on the beautiful rear deck while overlooking the beautiful perennial wildflowers, rose bushes and hydrangeas. Ideally situated near major highways, local shopping centers and restaurants. This house is ready for anyone to make it their dream home! Adjustments: GLA :-$2160, Year Built :-$600, Lot size :$180, Bed :$3000, Full bath :$1500, Half bath :-$1000, Location:-$20,000

4. **Sale 3 Comments** - Superior: Move-in ready and renovated 4 bedroom 2 bath home with almost 2000 sq feet of living space. Open floor plan features a living room, dining room and family room leading to the brand new kitchen with quartz counters, white shaker cabinets and stainless steel appliances. Gleaming maple hardwood floors throughout the entire house, 4 bedrooms on the 2nd floor, 2 tiled updated ba hrooms, new fha gas heating system, new central air condi ioning, all brand new windows, new electric, plumbing, and insulation plus a full unfinished basement with high ceilings and a fenced-in yard with ample off-street parking complete this inviting home. Adjustments: GLA :-$3210, Year Built :-$1800, Lot size :$220, Condition :-$5000, Location:-$20,000

5. **Listing 1 Comments** - Superior: OPEN HOUSE SUN 10/4 12-2PM! College Hill area 4 bedroom 2 bath! Where else can you find this square footage in a nice neighborhood in Worcester??? The main level offer a large living / dining room combination w/ lots of windows and plenty of natural light as well as new flooring. There is also one bedroom and a full bath on the 1st floor. The kitchen has upgraded cabinets and will come with the appliances. The 2nd floor offers 3 bedrooms, another full bathroom and another room that could be an office or a 2nd floor living room. The basement is dry and perfect for storage. Washer and dryer will stay. There is even an enclosed hot tub room and the hot tub will stay! You'll love the picture perfect backyard. There is even a shed for your lawnmower and garden tools. The main heating is oil but there is gas in the house already. If you're looking for space and a great price, this is the one. Very conveniently located to 290, Holy Cross, Auburn, etc. Adjustments: GLA :-$1650, Year Built :$1530, Lot size :$120, Location:-$20,000

6. **Listing 2 Comments** - Similar: Fantastic opportunity to buy and OWN a home in Worcester on the Auburn Line! Located on a discreet dead end street minutes from Hadwen Park! Open living room, dining, and eat in kitchen. Features include hardwood floors, gas fireplace and beautiful country kitchen island. Sun drenched, enclosed porch which wraps around the front and side of house. Two nice size bedrooms on the second floor and bonus room for sitting area or den and bath. Fabulous yard with 2 storage sheds. PRICED TO SELL THIS HOUSE WILL NOT LAST! Offers DEADLINE Monday 9/14 by 12pm Adjustments: GLA :$3705, Year Built :-$510, Lot size :-$80, Bed :$6000, Full bath :$1500, Half bath :-$1000, Location:-$20,000

7. **Listing 3 Comments** - Inferior: Fantas ic opportunity in a desirable commuter neighborhood on a dead end road! Recent updates throughout the home. Nice size kitchen with island, granite counter tops and stainless steel appliances. Huge master bedroom and lots of closet space throughout the home. Dining room has sliding doors that lead out to a large deck. The home has been well taken care of. Roof and furnace approximately 4 years old. Has a one car garage with storage. Nice size yard for the family to enjoy outdoor fun. Easy access to Mass Pike, Rt-20, Rt-146 and I-290. Everything you need is close by while still maintaining the feeling of privacy! Adjustments: GLA :$4575, Year Built :-$1800, Lot size :-$180, Bed :$3000, Garage :-$2000, Condition :-$5000, Location:-$20,000

STATEMENT OF ASSUMPTIONS AND L MITING CONDITIONS: This report is subject to following assumptions and limiting condi ions:
1. Assumes hat the title is good and marketable and will not render any opinions about the title.
2. Assumes both tax and MLS data is current and accurate.
3. The preparer is not a surveyor, he or she makes no guarantees, express or implied, regarding accuracy of the properties boundaries, nor any special designa ions, such as Special Flood Hazard Areas.
4. For exterior inspections, the agent has investigated all resources available such as MLS, public records, online data, prior inspections,and information provided by the client to identify the physical characteristics, which includes the interior condition, of the subject property. If reliable information is discovered about the interior condition that is or is not consistent with the exterior condi ion, then the agent has incorporated hat information into their report. Otherwise, the agent has made an assumption that the interior condition of the property is consistent with the observed exterior condition.
5. The report notes any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she become aware of during the research involved in performing his report. Unless otherwise stated in this report, there is no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of he property (such as, but not limited to, need repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The preparer will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the preparer is not an expert in the field of environmental hazards, this report must not be considered as an environmental assessment of the property.
6. The as "Repaired" conclusion is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

This document was created by an independent agent for RRReview. The following me hodology was used with consideration for RRReview policies and any specific client requirements.
**Data Collection:** Public and/or private data was collected and analyzed, including but not limited to all available tax documentation and MLS data, to determine neighborhood characteristics, local market conditions, use, zoning, tax assessments, physical characteristics, transaction history and past or current listing information. Information was then gathered on six other properties that are comparable to the subject property in location, use and dominant features: three that have been recently sold and three that are currently listed for sale.
**Site Inspection:** Per the client instruc ions, the subject property and surrounding neighborhood were inspected and photographed. This inspection may have been of the interior and/or exterior based on the inspection type. The inspection included a review for the condition of the dwelling, improvements, and any other positive or negative features. Any known environmental issues or functional or economic obsolescence are also taken into consideration.
**Reconciliation:** The collected data was then compiled with information collected from the site inspection and compared to the information from the selected comparables. The properties were compared to the subject using he sales comparison approach, which is primarily based upon the principle of substitution. The property condition, market conditions and any other noted positive or negative influences were also considered. The analysis resulted as a single figure or a range of values, as ordered by the client.
**Reporting:** The summary of the results and the data collection, site inspection and reconcilia ion were provided on the appropriate report form as ordered by the client.

**Please note:** Certain state and federal laws may prohibit and/or restrict a real estate licensee who estimates the price/value of real property or may restrict the types of transactions for which the real estate licensee's report can be used. You may wish to confirm with your legal advisor to ensure hat this report is used for an appropriate purpose, as set forth in applicable state and federal law.
**Certifications:**
The agent and/or broker has certified that they are covered by errors and omissions insurance, to the extent required by state law, for all liability associated with the preparation of

this report.

The agent and/or broker who executed this report has no existing or contemplated interest in the subject property.



Subject Property Front View - 137 Greenwood St , 01607



Subject Property Right Side View



Subject Address Verification



Subject Street Scene



Sale 1 Photo - 55 Southhold Rd, 01607 — $240,000



Sale 2 Photo - 7 Blaine Ave, 01603 — $278,400



Sale 3 Photo - 12 Halmstad St, 01607 — $298,900



Listing 1 Photo - 5 Tennyson St, 01610 — $239,900



Listing 2 Photo - 13 Knox Street, 01603 — $273,900



Listing 3 Photo - 9 Aurilla Street, 01607 — $299,999



| Legend | Property | Distance | Street |
|---|---|---|---|
| X | Subject | 0 Miles | 137 Greenwood St , 01607 |
| 1 | Sale 1 | 0.67 Miles | 55 Southhold Rd, 01607 |
| 2 | Sale 2 | 2.92 Miles | 7 Blaine Ave, 01603 |
| 3 | Sale 3 | 0.25 Miles | 12 Halmstad St, 01607 |
| 4 | Listing 1 | 0.81 Miles | 5 Tennyson St, 01610 |
| 5 | Listing 2 | 2.27 Miles | 13 Knox Street, 01603 |
| 6 | Listing 3 | 0.88 Miles | 9 Aurilla Street, 01607 |

**Agent Information**

Prepared By Agent: Nick Wishart
Agent Email: nickcwishartbpo@gmail.com
Broker: Bruce Lane
Distance to Subject: 5.01 miles
Electronically Signed: 10/3/2020 2:10:00 PM

Agent Phone: (401) 323-9742
License Number: ████
Expiration Date: 3/6/2021
Years Experience: 5

**Legal Disclaimer**

Notwithstanding any preprinted language to the contrary, this opinion is not an appraisal of market value of the subject property. If an appraisal is desired, the services of a licensed or certified appraiser must be obtained.

© 2010 Residential RealEstate Review, all rights reserved.